WILLIAM E. JONES, Employee/Plaintiff,
v.
FOOD LION, SELF INSURED and RISK MANAGEMENT SERVICES, INC., SERVICING AGENT, Defendants.
No. COA08-451
Court of Appeals of North Carolina.
Filed December 16, 2008
This case not for publication.
Brantley, Jenkins, Riddle, Hardee & Hardee, by J. Christopher Brantley, for Plaintiff-Appellee.
Hedrick, Gardner, Kincheloe & Garofalo, L.L.P., by Erika D. Jones and Susan J. Vanderweert, for Defendants-Appellants.
ARROWOOD, Judge.
Food Lion and Risk Management Services, Inc., (Defendants) appeal from Opinion and Award of the North Carolina Full Industrial Commission concluding that William E. Jones' (Plaintiff's) right thumb carpometacarpal joint arthritis was an occupational disease due to causes and conditions characteristic of and peculiar to his employment, and awarding Plaintiff $439.17 temporary total disability per week until Plaintiff returns to work or until further order of the Industrial Commission. We affirm.
Fifty-five-year old Plaintiff worked as a meat cutter for several different employers for a total of thirty-three years. He worked for Food Lion for thirteen years. As a meat cutter for Food Lion, Plaintiff's duties included cutting meat, putting pre-packaged meat on display in the deli, ordering meat, unloading trucks and making work schedules for other employees in the meat department. The temperature in the meat department was kept between forty-eight and fifty degrees to prevent the meat from spoiling. When Plaintiff cut meat, he used a large knife and a circular saw. Large meats, such as pork chops, required Plaintiff to lift the entire section of pork, weighing more than twenty pounds, grip it "forcefully[,]" and "push it repeatedly" through the blade of the circular saw. Plaintiff is right-handed and would grip the handle of the circular saw with his fingers, pushing the meat through with his thumb. He made hundreds of knife strokes per day, and on busy days, Plaintiff might make over one thousand knife strokes. Plaintiff slowly, and over years, developed pain at the base of his right thumb.
In September 2003, Plaintiff sought treatment at Mt. Olive Family Medicine. Physician's Assistant, Peggie Parks (Parks), treated him with anti-inflammatory medication for what appeared to be tendinitis from overuse. Plaintiff returned to Parks with persistent symptoms in January and April 2004, after which Parks advised Plaintiff to see an orthopedic surgeon.
On 4 May 2004, Plaintiff saw Dr. William de Araujo (Dr. de Araujo), who x-rayed the joint, revealing carpometacarpal joint arthritis. Dr. de Araujo injected the joint that day and again on 16 December 2004. Plaintiff's symptoms became worse over the following months, and by April 2005, Plaintiff did not think he could continue doing his job. On 11 April 2005, Plaintiff returned to Dr. de Araujo, who advised Plaintiff that he "was ready for surgery." On 31 May 2005, Dr. de Araujo performed surgery on Plaintiff's hand, removing part of the arthritic trapezium bone and using a tendon from Plaintiff's forearm to reconstruct the joint. Plaintiff developed painful scar tissue from the removal of the tendon.
Even after the surgery, Plaintiff continued to experience pain and weakness, and Dr. de Araujo sent Plaintiff to occupational therapy, recommending that Plaintiff undergo a "functional capacity evaluation[.]" Dr. de Araujo did not believe Plaintiff "would be able to return to work as a meat cutter." Plaintiff, who wanted to work in his former capacity, sought a second opinion from Dr. Post, a surgeon in Raleigh, who evaluated him on 14 December 2005 and recommended a second surgical procedure to remove the remainder of the trapezium bone and use another tendon to reconstruct the joint. Dr. Post performed this operation on 9 January 2006, and afterwards, Plaintiff underwent therapy to work on his range of motion and strength.
After Plaintiff's second surgery, he continued to experience "pain, weakness and limitation of motion" in his right hand. Plaintiff also developed a "tremor" in his hand. Dr. Post restricted Plaintiff's work to "no lifting more than five pounds" and "no repetitive forceful gripping or grasping[.]" Plaintiff was also required to wear a splint. Dr. de Araujo recommended that Plaintiff undergo an evaluation by a neurologist or at the motion disorder clinic at Duke Medical Center regarding Plaintiff's tremor, which developed after his second surgery. On 25 September 2006, when Dr. de Araujo last saw Plaintiff, the doctor recommended vocational rehabilitation to assist Plaintiff in finding work that would not require "three-point pinching[,]" "exposure to cold temperatures[,]" or "lifting of more than five pounds[.]" Dr. de Araujo also recommended that Plaintiff wear a brace when doing any lifting.
Food Lion did not offer Plaintiff work within Dr. de Araujo's restrictions, and therefore, Plaintiff was unable to work in any capacity from 31 May 2005  the date of Plaintiff's first surgery  until 28 March 2006, when Dr. Post released Plaintiff to "light duty." On 12 June 2006, Dr. de Araujo stated that Plaintiff had reached "maximum medical improvement" with respect to his carpometacarpal joint arthritis, but not with respect to the "tremor" in his hand. At the time the evidence closed, the Full Commission stated that "[i]t appears that plaintiff should undergo an independent medical evaluation regarding the tremor before a decision can be made regarding this issue."
Defendants appeal from the Opinion and Award of the Full Commission.
"[O]ur Workers' Compensation Act should be liberally construed to effectuate its purpose to provide compensation for injured employees or their dependents, and its benefits should not be denied by a technical, narrow, and strict construction." Adams v. AVX Corp., 349 N.C. 676, 680, 509 S.E.2d 411, 413 (1998). Under our Workers' Compensation Act, "the Commission is the fact finding body." Brewer v. Powers Trucking Co., 256 N.C. 175, 182, 123 S.E.2d 608, 613 (1962). "The Commission is the sole judge of the credibility of the witnesses and the weight to be given their testimony." Anderson v. Lincoln Constr. Co., 265 N.C. 431, 433-34, 144 S.E.2d 272, 274 (1965).
"Appellate review of an opinion and award from the Industrial Commission is generally limited to determining: '(1) whether the findings of fact are supported by competent evidence, and (2) whether the conclusions of law are justified by the findings of fact.'" Hassell v. Onslow County Bd. of Educ., 362 N.C. 299, 305, 661 S.E.2d 709, 713 (2008) (quoting Clark v. Wal-Mart, 360 N.C. 41, 43, 619 S.E.2d 491, 492 (2005)). "The findings of fact by the Industrial Commission are conclusive on appeal if supported by any competent evidence." Gallimore v. Marilyn's Shoes, 292 N.C. 399, 402, 233 S.E.2d 529, 531 (1977). Thus, on appeal, this Court "[cannot] weigh the evidence and decide the issue on the basis of its weight. This C]ourt's duty goes no further than to determine whether the record contains any evidence tending to support the finding." Anderson, 265 N.C. at 434, 144 S.E.2d at 274.

Occupational Disease
In Defendants' first argument, they contend that the Industrial Commission erred in finding that Plaintiff developed an occupational disease pursuant to N.C. Gen. Stat. § 97-53(13). We disagree.
N.C. Gen. Stat. § 97-53 (2007), states that "[t]he following diseases and conditions only shall be deemed to be occupational diseases within the meaning of this Article":
(13) Any disease, other than hearing loss covered in another subdivision of this section, which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment.
"[T]his provision does not require that the disease originate exclusively from or be unique to the particular occupation." Hassell v. Onslow County Bd. of Educ., 362 N.C. 299, 306, 661 S.E.2d 709, 714 (2008) (citing Rutledge v. Tultex Corp./Kings Yarn, 308 N.C. 85, 101-02, 301 S.E.2d 359, 369-70 (1983)). A plaintiff worker satisfies the elements of this statute if she shows that her employment:
exposed [her] to a greater risk of contracting [the] disease than members of the public generally, and [that] the . . . exposure . . . significantly contributed to, or was a significant causal factor in, the disease's development. This is so even if other non-work-related factors also make significant contributions, or were significant causal factors.
Rutledge, 308 N.C. at 101, 301 S.E.2d at 369-70. The two-pronged proof requirement for an occupational disease pursuant to N.C. Gen. Stat. § 97-53(13) (2007), increased risk and significant contribution, has been approved and applied repeatedly by our Courts. See e.g., Hassell, 362 N.C. at 306, 661 S.E.2d at 714;Wilkins v. J.P. Stevens & Co., 333 N.C. 449, 453, 426 S.E.2d 675, 677 (1993); James v. Perdue Farms, Inc., 160 N.C. App. 560, 562-63, 586 S.E.2d 557, 560-61 (2003).
The Full Industrial Commission made the following pertinent findings of fact with regard to whether Plaintiff's job increased his risk of or contributed significantly to his joint arthritis:
1. As of the date of hearing before the Deputy Commissioner, plaintiff was fifty-eight years old. He completed the tenth grade, but later obtained a GED. For thirty-three years, he worked as a meat cutter or butcher for multiple employers, including defendant Food Lion, for whom he worked a total of thirteen years. His second period of employment with defendant began on May 4, 1995. As a meat cutter, his duties included cutting meat, putting pre-packaged meat on display in the deli, ordering meat, making up work schedules for the other employees in the meat department and unloading trucks.
2. The meat department was kept between forty-eight and fifty degrees in order to prevent the meat from spoiling. Plaintiff also had to periodically go inside the freezer. He spent the majority of his time at work cutting meat. Many of the cuts required him to use a large knife. However, there was a circular saw for cuts such as pork chops. In order to make them, he would have to lift the entire section of pork, which weighed more than twenty pounds, grip it forcefully and push it repeatedly through the blade.
3. Plaintiff is right handed. When cutting meat with a knife, he would grip the handle with his fingers and put his right thumb on top of the knife above the blade in order to push it through the meat. Cutting meat with a knife put considerable pressure on his right thumb, and he made hundreds of knife strokes during a day. On busy days, he could make over a thousand strokes. He not only used the knife to cut the specific cuts of meat, he also trimmed fat and unusable sections off of the meat. Once the meat was cut, plaintiff wrapped it for display.
4. While working for defendant, plaintiff developed pain at the base of his right thumb. He noticed it for years but in September 2003 the pain intensified to the point that he sought treatment at Mt. Olive Family Medicine. On September 26, 2003 he saw Peggie Parks, a physician's assistant with Mt. Olive. She treated him with anti-inflammatory medication for what appeared to be tendonitis [sic] from an overuse syndrome. Plaintiff returned to her with persistent symptoms in January and April 2004. She injected the joint at the latter appointment. Ms. Parks advised plaintiff at that time that he would need to see an orthopedic surgeon for further treatment of his thumb problem.
5. Consequently, on May 4, 2004 plaintiff went to Dr. de Araujo. On examination, he had symptoms associated with stress to the carpal/metacarpal (CMC) joint, and x-rays revealed arthritis at that joint. Dr. de Araujo injected the joint that day. The injection gave plaintiff sufficient relief and he did not return to the doctor until December 16, 2004. However, by the follow-up visit in December, his symptoms were interfering with his job. Dr. de Araujo injected the joint again on that occasion.
6. Plaintiffs symptoms gradually became worse over the following months and by early April he did not believe that he could continue doing his job. He returned to Dr. de Araujo on April 11, 2005 and advised that he was ready for surgery. There was a delay in scheduling the procedure due to the question of whether plaintiffs workers' compensation claim would be accepted. Defendants subsequently denied the claim, so plaintiff apparently filed his medical bills with his group health insurance.
7. On May 31, 2005, Dr. de Araujo performed surgery on plaintiffs hand. The doctor removed part of the aahritic trapezium bone and used a tendon to reconstruct the joint. Following the operation, plaintiff developed some painful scar tissue on his forearm at the site where the tendon had been harvested, and the doctor advised him to treat the area with massage and heat. His thumb was casted and then put in a splint in August.
8. Despite the surgery, plaintiff continued to experience pain and weakness. Dr. de Araujo sent him to occupational therapy and then recommended that he undergo a functional capacity evaluation because it did not appear that he would be able to return to work as a meat cutter. Plaintiff very much wanted to be able to return to work in his former capacity and wanted to know if there was an alternative treatment available, so he subsequently went to Dr. Post, a hand surgeon in Raleigh, for a second opinion. Dr. Post evaluated him on December 14, 2005, and recommended a second surgical procedure to remove the remainder of the trapezium bone and to use another tendon graph to reconstruct the joint.
9. Dr. Post performed the operation on January 9, 2006. He subsequently removed the K-wire inserted during the operation and sent plaintiff for therapy in order to work on his range of motion and then on his strength. Despite the additional surgery and treatment, plaintiff continued to experience pain, weakness and limitation of motion in his hand. He also developed a tremor in the hand after the second surgery. Dr. Post ultimately released him to return to work with restrictions of no lifting more than five pounds and no repetitive forceful gripping or grasping, and he was to wear a splint.
10. Plaintiff then returned to Dr. de Araujo for further follow-up care. Dr. de Araujo was of the opinion that plaintiff would never be able to return to work as a butcher. The doctor did not know what had caused the tremor and recommended that plaintiff be evaluated by a neurologist or at the motion disorder clinic at Duke Medical Center regarding that condition. Having not improved despite two operations to his hand, plaintiff was reluctant to pursue medical evaluation and treatment. He appeared frustrated and somewhat anxious in July 2006, so Dr. de Araujo prescribed Ativan for him. Ms. Parks had also treated him earlier that year for anxiety associated with being out of work and being "cooped up" at home.
11. On September 25, 2006 when Dr. de Araujo last saw plaintiff, the doctor did not recommend any further surgical procedure to the hand for fear that it could make the tremor worse, and he recommended vocational rehabilitation to assist plaintiff in finding work which would not require much three-point pinching, exposure to cold temperatures or lifting of more than five pounds and where he could wear a brace when doing any lifting.
12. Defendant would not offer work to plaintiff within his restrictions at anytime prior to the hearing, and plaintiff had the impression that his employment with the company had been terminated.
13. Prior to May 31, 2005, plaintiff developed arthritis of the CMC joint of his right hand. This condition developed as a result of the repetitive, forceful use of his thumb in cutting meat at work. He was placed at an increased risk of developing the CMC joint arthritis due to his job duties as a meat cutter as compared to the general public not so employed. His job duties with defendant were a significant contributing factor in the development of his right thumb CMC joint arthritis.
14. Plaintiff has proven that he developed an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with defendant and which excluded all ordinary diseases of life to which the general public was equally exposed.
15. As a result of his right thumb condition, plaintiff was unable to work in any capacity from May 31, 2005, when he had his first surgery, until March 28, 2006, when Dr. Post released him to light duty. He remained unable to work as a meat cutter at that time and was not expected to ever be able to return to work in that capacity. Due to his persistent symptoms, he would not be able to work in any job which would require much three-point pinching, lifting of more than five pounds or exposure to extreme temperature, and he would have to be allowed to wear a brace when doing any lifting.
16. Plaintiff had wanted to return to work as a meat cutter, since it was a job he had performed for thirty-three years, and he was showing signs of depression and anxiety because he was not able to get out and work. At the time of the hearing before the Deputy Commissioner, he was taking computer classes in order to make himself more marketable, but he could not type with his right hand because of his hand condition. He had not found suitable alternative employment as of the date of the hearing before the Deputy Commissioner.
17. Plaintiff reached maximum medical improvement with respect to his CMC joint arthritis by June 12, 2006 when Dr. de Araujo rated him. However, he had developed a significant tremor in his hand by that time and the tremor was not evaluated by an expert in motion disorders to determine if it was related to his compensable condition or whether treatment would help it. Therefore, by the time the evidence closed in the case before the Deputy Commissioner, it was not clear whether plaintiff had reached maximum medical improvement with respect to all conditions arising from his occupational disease. It appears that plaintiff should undergo an independent medical evaluation regarding the tremor before a decision can be made regarding this issue.
This Court's duty is merely to determine whether the record contains any evidence tending to support the Commission's findings, and here, the Commission's challenged findings are supported by competent evidence. Dr. de Araujo stated, "given the type of work that he does, I'm sure that it was a contributing factor to his arthritis." When asked whether he had an opinion "to a reasonable degree of medical certainty . . . [the] symptoms were caused, aggravated, or accelerated by [Plaintiff's] occupation as a meat cutter[,]" Dr. de Araujo stated, "Yes, I do believe they were." The physician's assistant, Parks, also stated, "[i]t is my opinion his problem is related to his occupation as a meat cutter."
We conclude there is competent evidence in the record to support the findings of fact of the Full Commission that Plaintiff "developed an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment[.]" The testimony of Dr. de Araujo, in and of itself, provides competent evidence that Plaintiff's employment put him at an increased risk of developing carpometacarpal joint arthritis and that his employment significantly contributed to his joint arthritis. Thus, the Full Commission did not err in finding andconcluding that Plaintiff's joint arthritis was an occupational disease pursuant to N.C. Gen. Stat. § 97-53(13). The associated assignments of error are overruled.

Disability
In Defendants' second argument, they contend that the Industrial Commission erred in finding that Plaintiff is disabled pursuant to N.C. Gen. Stat. § 97-2(9) as a result of his carpometacarpal joint arthritis. We disagree.
N.C. Gen. Stat. § 97-2(9) (2007), defines "disability" as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." Id. Accordingly, disability is the impairment of the injured employee's earning capacity rather than physical disablement. Peoples v. Cone Mills Corp., 316 N.C. 426, 434, 342 S.E.2d 798, 804 (1986).
The initial burden is on the employee to show that he is unable to earn the same wages he had earned before the injury, either in the same employment or in other employment.Hilliard v. Apex Cabinet Co., 305 N.C. 593, 595, 290 S.E.2d 682, 684 (1982). The employee may meet this burden in one of four ways:
(1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4)the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury.
Russell v. Lowes Prod. Distribution, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).
In the instant case, Plaintiff produced competent evidence "that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment[.]" Russell, 108 N.C. App. at 765, 425 S.E.2d at 457. Plaintiff is fifty-eight years old and has a tenth grade education and a GED. Plaintiff has worked as a meat cutter for thirty-three years  more than half the span of his life. Plaintiff has no other skills or licenses, and his work experience is related only to meat cutting. Dr. de Araujo testified that Plaintiff could not do work which would require three point pinching or grasping with his hand, or which would expose Plaintiff to cold temperatures or require Plaintiff to lift more than five pounds. Further, Plaintiff must wear a brace when doing any lifting. Dr. de Araujo considered Plaintiff permanently unable to perform the work of a butcher or meat cutter. Plaintiff testified that he attempted to take keyboard classes but experienced significant difficulty and pain. Defendants had no positions available within the ambit of Plaintiff's restrictions.
"[O]nce the claimant meets this initial burden, the defendant who claims that the plaintiff is capable of earning wages must come forward with evidence to show not only that suitable jobs are available, but also that the plaintiff is capable of getting one, taking into account both physical and vocational limitations." Kennedy v. Duke University Medical Center, 101 N.C. App. 24, 33, 398 S.E.2d 677, 681 (1990). Despite arguing on appeal that Plaintiff is not disabled, Defendants failed to present any evidence of Plaintiff's capability to earn wages, given Plaintiff's limitations, in any employment.
We conclude that the evidence in this case is sufficient to establish Plaintiff's disability pursuant to N.C. Gen. Stat. § 97-2(9). This assignment of error is overruled.

Independent Medical Examination
In Defendants' third argument, they contend that the Industrial Commission erred by finding that Plaintiff was entitled to an independent medical examination for his tremor in his hand because there was insufficient evidence that the tremor was related to Plaintiff's joint arthritis and employment as a meat cutter. We disagree.
"[W]here the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." Click v. Pilot Freight Carriers, Inc., 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). However, "when such expert opinion testimony is based merely upon speculation and conjecture, it can be of no more value than that of a layman's opinion." Young v. Hickory Bus. Furniture, 353 N.C. 227, 230, 538 S.E.2d 912, 915 (2000). "[A]n expert is not competent to testify as to a causal relation which rests upon mere speculation or possibility." Dean v. Carolina Coach Co., 287 N.C. 515, 522, 215 S.E.2d 89, 94 (1975).
In the instant case, Plaintiff developed an "intention tremor" after his second surgery. Dr. de Araujo testified that "[d]ystonia can be caused from trauma, and trauma could be surgical. So, just from the stress of surgery or from the nerve blocks used to perform the anesthesia for the surgery[,]" dystonia could result. Dr. de Araujo further stated that the disorder had a temporal relationship to Plaintiff's second surgery. Dr. de Araujo described the tremor: "[W]hen he tried to oppose the thumb to the index and long finger, his hands started shaking[,]" and "a neurologist would be somebody to ask about the etiology of it[.]"
The Full Commission found that "[the] doctor did not know what had caused the tremor and recommended that plaintiff be evaluated by a neurologist or at the motion disorder clinic at Duke Medical Center regarding that condition." The Commission further found and concluded the following:
[T]he tremor was not evaluated by an expert in motion disorders to determine if it was related to his compensable condition or whether treatment would help it. Therefore . . . it is not clear whether plaintiff had reached maximum medical improvement with respect to all conditions arising from his occupational disease.
Defendants essentially argue that because Dr. de Araujo did not know the etiology of Plaintiff's intention tremor, the Commission erred by concluding that Plaintiff should see an expert to determine the etiology of the tremor. Defendant relies on Young v. Hickory Bus. Furniture, for their argument. In Young, the Industrial Commission found that a claimant's fibromyalgia had been caused by an accident at work based solely on the opinion testimony of Dr. Payne, who stated that "I think that [the claimant] does have fibromyalgia and I relate it to the accident primarily because, as I noted, it was not there before and she developed it afterwards. And that's the only piece of information that relates the two." Young, 353 N.C. at 232, 538 S.E.2d at 916. The instant case is distinguishable from Young in two ways: (1) the evidence that Plaintiff's intention tremor may have been caused by the second surgery is greater than merely "post hoc ergo propter hoc[,]" as Defendant contends, Id. at 232, 538 S.E.2d at 916; and more pertinently, (2) the Full Commissiondid not find that the tremor was caused by the second surgery but specifically and unequivocally stated that an expert should "determine [whether the tremor] was related to his compensable condition or whether treatment would help it." (emphasis added).
This Court has also held that "[s]o long as there is some evidence of substance which directly or by reasonable inference tends to support the findings, this Court is bound by such evidence, even though there is evidence that would have supported a finding to the contrary." Rose v. City of Rocky Mount, 180 N.C. App. 392, 400, 637 S.E.2d 251, 257 (2006). Here, there is sufficient evidence to support the Full Commission's finding that an expert should determine whether the tremor was related to Plaintiff's compensable condition, and if so, whether Plaintiff hasreached maximum medical improvement. This assignment of error is overruled.
For the foregoing reasons, we affirm the Opinion and Award of the North Carolina Full Industrial Commission.
Affirmed.
Judges WYNN and BRYANT concur.
Report per Rule 30(e).